

Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | P. Michael Mahoney | Sitting Judge if Other than Assigned Judge | Philip G. Reinhard |
|---|---|---|---|
| **CASE NUMBER** | 01 C 50081 | **DATE** | 3/28/2002 |
| **CASE TITLE** | KENNEDY vs. BARNHART | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m) ☐ General Rule 21 ☐ FRCP41(a)(1) ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] As stated in the attached, this court grants Plaintiff's motion for summary judgment and denied Defendant's motion for summary judgment. It is ordered that this case be remanded for a redetermination of Plaintiff's Residual Functional Capacity in light of this court's findings. It is further ordered that a vocational expert be consulted to determine whether Plaintiff is capable of performing a substantial number of jobs existing in the economy as provided for in Step Five of the sequential analysis. Enter attached Memorandum Opinion and Order

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | | **Document Number** |
|---|---|---|---|---|---|---|
| | No notices required. | | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | | MAR 29 2002 | | 19 |
| | Notified counsel by telephone. | | | date docketed | | |
| | Docketing to mail notices. | | | | | |
| | Mail AO 450 form. | | | docketing deputy initials | | |
| | Copy to judge/magistrate judge. | | | 3/28/2002 | | |
| | | courtroom deputy's initials | | date mailed notice | | |
| | tml | | | gg | | |
| | | | Date/time received in central Clerk's Office | mailing deputy initials | | |

# United States District Court
## Northern District of Illinois
### Western Division

| | |
|---|---|
| DAVID E. KENNEDY | **JUDGMENT IN A CIVIL CASE** |
| v. | Case Number: 01 C 50081 |
| DEPT. HEALTH & HUMAN SERVICES | |

☐ Jury Verdict. This action came before the Court for a trial by jury. The issues have been tried and the jury rendered its verdict.

■ Decision by Court. This action came to hearing before the Court. The issues have been heard and a decision has been rendered.

IT IS HEREBY ORDERED AND ADJUDGED that Plaintiff's motion for summary judgment is granted and defendant's motion for summary judgment is denied. Judgment is entered in favor of the plaintiff and against the defendant. Case is remanded to the ALJ.

Michael W. Dobbins, Clerk of Court

Date: 3/28/2002

Gale L. Graeff, Deputy Clerk

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### WESTERN DIVISION

DAVID E. KENNEDY,         )
         )
     Plaintiff,        )       Case No.  01 C 50081
         )
     v.         )       Philip G. Reinhard
         )       P. Michael Mahoney
JO ANNE B. BARNHART,     )
COMMISSIONER OF SOCIAL     )
SECURITY,         )
         )
     Defendant.       )

## MEMORANDUM OPINION AND ORDER

Plaintiff, (Plaintiff), seeks judicial review of the final decision of the Commissioner of the Social Security Administration (Commissioner). See 42 U.S.C. §§ 405(g), 1383(c)(3). The Commissioner's final decision denied Plaintiff's application for Disability Insurance Benefits (DIB) pursuant to Title XVI of the Social Security Act (the Act). 42 U.S.C. §1381(a). This matter is before the Magistrate Judge pursuant to consents filed by both parties on May 7, and May 9, 2001. See 28 U.S.C. § 636(c); Fed. R. Civ. P. 73.

## I.     BACKGROUND

Plaintiff filed for DIB on September 29, 1998, alleging disability beginning on October 3, 1997. (Tr. 70-72). Plaintiff's application for benefits was denied on February 1, 1999. (Tr. 50). On March 5, 1999, Plaintiff filed a request for reconsideration. (Tr. 54-56). Plaintiff's request for reconsideration was denied on July 20, 1999. (Tr. 57-59). Plaintiff then filed a request for a hearing before an Administrative Law Judge (ALJ) on August 2, 1999. (Tr. 60-61). Plaintiff appeared, with

counsel, before an ALJ on December 16, 1999. (Tr. 22-47). In a decision dated February 24, 2000, the ALJ found that Plaintiff was not entitled to DIB. (Tr. 13-21). On April 7, 2000, Plaintiff requested a review of the ALJ's decision by the Appeals Council. (Tr. 8-9). On February 5, 2001, the Appeals Council denied Plaintiff's request for review. (Tr. 4-5).

## II.    FACTS

Plaintiff, born November 1, 1952, was 47 years old at the time of the hearing and attended school through the eighth grade. (Tr. 30). Plaintiff testified that, at the time of the hearing, he was suffering from a lung infection. (Tr. 29-30). Plaintiff's attorney stated that treatment of Plaintiff's back impairment had been put on hold so that Plaintiff's cardiovascular disorder could be addressed. (Tr. 30). Plaintiff stated that he had been scheduled for back surgery, but that he then developed pneumonia and it was determined that he was not a good candidate for back surgery. (Tr. 38). Plaintiff had had two epidural blocks done and neither provided him with any relief. (Tr. 38). Plaintiff testified that he had recently had an appointment for a stress test but was unable to complete it due to pain in his legs and lower back. (Tr. 26). While Plaintiff had recovered from his pneumonia, he testified that he did suffer from shortness of breath and fatigue. (Tr. 40). Plaintiff stated that he experienced shortness of breath since his hospitalization for pneumonia and that he has to use inhalers every day. (Tr. 40). As to his back condition, Plaintiff stated that he has back pain and pain, burning and numbness radiating down his legs and that condition often keeps him from sleeping comfortably. (Tr. 42). Plaintiff testified that he takes three to four Vicodin pills a day for the pain in his back and legs and "doubles up" when the pain really bothers him. (Tr. 43). In a pain questionnaire, Plaintiff reported that he takes Flexiril, Ultram and Vicodin three to four times a day.

2

(Tr. 98). Plaintiff reported that the pain is constant and that bending, walking and sitting brings it on and that the medication sometimes helps and sometimes does not. (Tr. 98). As to his daily activities, Plaintiff reported that he has difficulty walking, but does try to help his wife out with the cooking and housekeeping, mows the lawn with a riding lawnmower, shops only when he has to and visits with his brother and sister once a month (Tr. 43, 86).

### III.    **MEDICAL HISTORY**

Plaintiff's medical records in this case are voluminous. For the sake of efficiency this court will summarize the records according to Plaintiff's primary impairments.

Plaintiff's back impairment

Plaintiff visited the emergency room at Saint Anthony Medical Center on May 29, 1996, with a chief complaint of low back pain. (Tr. 408). Plaintiff was examined and diagnosed with an acute lumbosacral strain. (Tr. 408). It was also noted that the x-rays taken indicated lipping and calcification in the aorta. (Tr. 408). Plaintiff was advised to quit smoking and follow up with his doctor, Dr. Lidvall. (Tr. 408).

In 1996, Plaintiff was treated by Dr. Steven Lidvall, MD, at Roxbury Family Medicine for a back injury he received at work. Dr. Lidvall's notes report that Plaintiff was seen on May 31, 1996, and stated that he had felt "something pull in his back" at work on May 29, 1996. (Tr. 113). Plaintiff reported that he had pain radiating down the back of both legs to his heels. (Tr. 113). Dr. Lidvall indicated that Plaintiff was suffering from a lumbar strain with a previous back injury, prescribed a course of steroids and pain-killers and recommended that Plaintiff remain off work until June 5, 1996. (Tr. 113). On June 14, 1996, Dr. Lidvall reported that Plaintiff could return to work

on June 17, 1996, with a 40 pound weight restriction and noted that Plaintiff was much improved with much less weakness and that Plaintiff experienced neuropathic-type radiating pain only occasionally and was usually able to change his position to get rid of it. (Tr. 112). Dr. Lidvall noted that an MRI had shown a bulging, but not completely herniated, disk. (Tr. 112). On June 21, 1996, Plaintiff reported to Dr. Lidvall that he was still having a fair amount of lumbar pain and was limping. (Tr. 112). Dr. Lidvall indicated that, though the MRI did not show it, he believed Plaintiff has significant disk disease and recommended that he consult a neurosurgeon. (Tr. 112). On July 17, 1996, Dr. Lidvall reported that Plaintiff was undergoing physical therapy and that Plaintiff could return to light duty work on August 5, 1996. (Tr. 110). On September 3, 1996, Dr. Lidvall reported Plaintiff was doing very well and could return to work full-time. (Tr. 111).

On October 17, 1997, electrodiagnostic testing of Plaintiff's lower extremities was performed in response to Plaintiff's complaints of parathesias in his left lower extremities. (Tr. 567). Dr. Madhav Srivastava, MD, who conducted the study, reported that the EMG did not show any evidence of denervation potentials. (Tr. 567). Dr. Srivatava also noted that motor nerve conduction velocity and sensory action potentials were normal in the left lower extremity. (Tr. 567).

Treatment notes from March 1996 through January 1998 indicate that Plaintiff was frequently seen for his low back and left leg impairment with little progress made in resolving his symptoms. (Tr. 204 - 222, 232-234). Plaintiff's treating physician, Dr. John Nepomuceno, MD, indicated that Plaintiff was being referred to a neurologist for surgical intervention to address the neurological involvement that was not responding to treatment. (Tr. 210-212). Those notes also report that a CT of October 8, 1997, indicates degenerative changes of Plaintiff's lumbar spine and normal EMG/NCV studies. (Tr. 217, 299). On July 14, 1998, Plaintiff was admitted overnight for severe

4

back pain. (Tr. 342-347). The records from that stay indicate that Plaintiff's neurologic exam was normal and no atrophy was noted. (Tr. 342). Dr. Nepomuceno consulted with Dr. Soriano (see below) and determined that Plaintiff could be discharged on July 15, 1998, and that he might benefit from epidural injections. (Tr. 342).

Additional treatment notes from Dr. Nepomucemo are from December of 1997 and 1998 and October of 1998. (Tr. 485-488). During those visits, Plaintiff complained of increasing leg and back pain as well as back spasms radiating to his leg. (Tr. 485-488). Dr. Nepomucemo noted that Plaintiff was walking with a slight limp and favoring his left side and that there was some tenderness in lumbosacral and left gluteal region. (Tr. 486). On December 10, 1998, Plaintiff asked Dr. Nepomucemo to fill out some SSI forms for him. (Tr. 485). Dr. Nepomucemo reported at that time that Plaintiff could flex to thirty degrees and extend zero to ten degrees on examination of the spine. (Tr. 485). On March 10, 1998, Dr. Nepomucemo's notes indicate that Plaintiff had seen Dr. Soriano who found that surgery was not warranted and returned Plaintiff to work. (Tr. 494). Plaintiff reported that he did return to work and was sent to the company doctor who believes that Plaintiff does need surgery. (Tr. 494). Dr. Nepomucemo found some sensory deficiencies on the left upper leg. (Tr. 494).

On February 25, 1998, Dr. Nepomucemo wrote a letter on Plaintiff's behalf regarding his impairments. (Tr. 476). Dr. Nepomucemo indicated that it was impossible to return Plaintiff to work due to his health status. (Tr. 476). Dr. Nepomucemo reported that Plaintiff suffered from increasing back and hip pain and had a herniated disk. (Tr. 476). According to Dr. Nepomucemo, Plaintiff was referred to a neurosurgeon but he then contracted pneumonia and has been unable to receive treatment for his back. (Tr. 476).

5

Plaintiff was seen on December 15, 1997, by an orthopedic specialist, Dr. Brian Bear, MD, regarding his low back pain. (Tr. 134). Dr. Bear reported that Plaintiff had some limited forward flexion and side bending secondary to pain with palpable paravertebral muscle spasms. (Tr. 134). Spinal CT indicated no evidence of herniation. (Tr. 134). Dr. Bear indicated that he examined Plaintiff and that his signs and symptoms were consistent with a herniated nucleus pulposus. (Tr. 130). Dr. Bear reported that a recent MRI revealed a far lateral L4-5 disk protrusion impinging on the L4 root nerve. (Tr. 130). Dr. Bear noted that Plaintiff has not responded to conservative treatment and that, also, his blood pressure was 200/108 and that he should contact his medical physician for evaluation and treatment as soon as possible. (Tr. 130).

Dr. Lidvall referred Plaintiff to a neurosurgeon, Dr. Marc Soriano, MD, in June of 1996. (Tr. 315-321). Dr. Soriano examined Plaintiff on June 29, 1996, and reported that there was a distinct lack of objective findings. (Tr. 316). Dr. Soriano noted that he was unclear as to the source of Plaintiff's continued and constant burning and pain into the left hip and leg. (Tr. 316). Dr. Soriano determined that Plaintiff was not a candidate for surgery or epidural injections because there is no impingement of the nerve roots and recommended physical therapy. (Tr. 316). Plaintiff was later seen by Dr. Soriano on March 3, 1998. (Tr. 176). In a report dated March 4, 1998, Dr. Soriano stated that his exam indicated negative straight leg raising and Lasegue signs, normal motor function, decreased sensation in the left leg and no atrophy. (Tr. 176). Dr. Soriano reported that Plaintiff was without any significant neurological deficit and was able to return to work with no limitations. (Tr. 176, 313). Plaintiff was seen again by Dr. Soriano on July 14, 1998. (Tr. 311). Dr. Soriano reported that Plaintiff was experiencing numbness in his right leg. (Tr. 311). Dr. Soriano's exam revealed a decrease in the right knee jerk with sensation intact in both lower extremities and no atrophy. (Tr.

6

311). Dr. Soriano reported that he could determine no source for Plaintiff's right leg numbness and that Plaintiff is not a surgical candidate and would not likely benefit from epidural injection but that a new MRI might change his opinion. (Tr. 311).

A March 5, 1998, report by John M. Koehler, MD, an occupational medicine consultant, indicates that Plaintiff requires stringent work restrictions as his disk herniation is symptomatic and pushing on the nerve root, causing parasthesia to the left lateral thigh. (Tr. 163). Dr. Koehler recommended that Plaintiff not lift more than 20 pounds and that he use a back support and proper lifting technique. (Tr. 163). Finally, Dr. Koehler noted that Plaintiff must be watched carefully as extending the disk herniation may cause further nerve compression, requiring surgery. Dr. Koehler indicated that Plaintiff is not a good surgical candidate, as surgery would cause serious risk to his overall well-being. (Tr. 163).

On March 12, 1998, Plaintiff was seen by Dr. Nepomucemo with regard to his high blood pressure. (Tr. 491). Dr. Nepomucemo noted that Plaintiff had received an epidural for his back pain and that it did not provide any relief and may have increased the pain. (Tr. 491). Dr. Nepomucemo noted that Plaintiff may benefit from a second opinion from another neurosurgeon regarding his back. (Tr. 491). On December 10, 1998, Dr. Nepomuceno completed a spinal disorders questionnaire for the Bureau of Disability Determination Services. (Tr. 164-165). Dr. Nepomuceno indicated that the onset date of Plaintiff's back pain was March 29, 1996, and that he suffered pain in his back, legs and hips with some sensory loss in his left leg. (Tr. 164). Dr. Nepomuceno reported that Plaintiff walked unassisted but did have a limp, had paravertebral muscle spasm in the lumbosacral spine and was unable to perform any lateral flexion or rotation. (Tr. 165). As to Plaintiff's ability to perform work activities, Dr. Nepomuceno indicated that Plaintiff is able to stand

for 30 to 45 minutes, sit for 60 to 75 minutes, is unable to bend over and is unable to push moderately heavy objects, such as a lawn mower. (Tr. 165).

On July 14, 1998, Plaintiff was admitted for an overnight stay at Saint Anthony Medical Center. (Tr. 341-343). Plaintiff arrived at the Emergency Room complaining of severe leg pain and numbness and an inability to stand. (Tr. 342). Plaintiff was seen by Dr. Soriano who reportedly did not believe the pain emanated from any of the disks and that Plaintiff was not a surgical candidate. (Tr. 342) Plaintiff was discharged in improved condition with medications. (Tr. 342-343).

An MRI of the spine, done on November 8, 1999, demonstrated a stable right paracentral bulge at L5-S1. (Tr. 559). No significant spinal or foraminal stenosis was noted. (Tr. 559). The 1999 MRI was compared to another MRI from November of 1998 and it was determined the bulge was unchanged. (Tr. 559).

In 1999, Plaintiff's care was taken over by Dr. Pedro deGuzman, MD. Dr. deGuzman saw Plaintiff on August 30, 1999, and reported that Plaintiff's low back pain had been increasing and that the pain became worse on activity. (Tr. 484). Dr. deGuzman noted some paravertebral muscle spasm, particularly in the lumbosacral area and tenderness on percussion. (Tr. 483). On October 29, 1999, Dr. de Guzman, noted that Plaintiff complained of progressive low back pain extending to his extremities. (Tr. 483). Dr. deGuzman noted the inconsistency of Plaintiff's pains; in that they are severe at times but do not necessarily worsen with activities that should exacerbate them. (Tr. 483). Straight leg raising for both lower extremities was equivocal. (Tr. 483).

Plaintiff's cardio-pulmonary impairments

On January 27, 1998, Plaintiff was admitted to Saint Anthony Medical Center in Rockford, Illinois, with fever, chills and chest pains. (Tr. 193). The admitting physician indicated that Plaintiff

had poor breath sounds and aeration due to bronchospasm, chronic obstructive pulmonary disease and asthma. (Tr. 193). Plaintiff was discharged on January 30, 1998, in an improved condition with instructions to continue medicating and follow up with Dr. Nepomucemo. (Tr. 195).

On February 1, 1998, Plaintiff was admitted to the ICU and treated for diffuse interstitial pneumonitis. (Tr. 139-159). Plaintiff was first seen in the emergency room for shortness of breath, accompanied by his wife, who reported that he had become increasingly short of breath and had become incoherent. (Tr. 140). At that time it was noted that Plaintiff was cyanotic, had a hard time speaking and that an exam of the lungs revealed coarse rales in all fields. (Tr. 140). A chest X-ray demonstrated bilateral nodular and irregularly margined interstitial alveolar infiltrates. (Tr. 144). An echocardiogram demonstrated normal cardiac function. (Tr. 144). On February 3, 1998, a bronchoscopy and bronchoalveolar lavage were performed on Plaintiff to aid in obtaining a definitive diagnosis. (Tr. 153). It was noted that Plaintiff had been becoming progressively ill, was not responding to medical management and had required incubation. (Tr. 152). On February 6, 1998, a left upper lobe thorascopic lung biopsy was performed on Plaintiff. (Tr. 157). The pathology report on the biopsy indicates Desquamative Interstitial Pneumonia (DIP) and the case was forwarded to the Mayo Clinic for a consultation. (Tr. 159). A chest X-ray from February 9, 1998, indicated congestive heart failure with pulmonary edema. (Tr. 258). Plaintiff was extubated on February 10, 1998, and discharged on February 17, 1998. (Tr. 139). A letter from Dr. Henry Tazelaar, M.D, a pathologist at the Mayo Clinic, indicates that the biopsy specimen obtained from Plaintiff demonstrates Diffuse Alveolar Damage (DAD), rather than DIP. (Tr. 137). Dr. Tazelaar stated that DAD is a pattern of acute lung injury associated with infections, noxious inhalants, drugs, septicemia or various forms of shock. (Tr. 137).

On March 27, 1998, Plaintiff returned to Saint Anthony Medical Center complaining of shortness of breath and persistent pain on the left side from his thoracoscopy. (Tr. 350-355). X-rays indicate clear lung fields and normal heart size with some minor atherosclerotic calcification of the aortic arch. (Tr. 352). Plaintiff's treating physicians indicated that he suffered from presumed tobacco-induced pulmonary disease (Plaintiff smoked a pack and a half of cigarettes per day) and recommended smoking cessation. (Tr. 355).

On October 13, 1998, Plaintiff was taken to Saint Anthony Medical Center by ambulance after becoming unresponsive at home. (Tr. 332). The treating physician noted that Plaintiff was agitated, hostile and uncooperative and that there was clear evidence of alcohol on his breath. (Tr. 332). On March 7, 1999, Plaintiff was admitted to Saint Anthony Medical Center for a cough and chest pain. (Tr. 325). Chest wall tenderness was noted. (Tr. 325). X-rays revealed a right lower lobe infiltrate and Plaintiff was discharged on March 8, 1999, with medication and instructed to follow up with Dr. Nepomucemo. (Tr. 325).

Plaintiff's blood pressure and chest pain were monitored by Dr. Nepomucemo. Plaintiff's blood pressure on January 16, 1998, was 190/24 and 180/100 on retake. (Tr. 202). Plaintiff complained of headaches as well as occasional chest pains. (Tr. 202). A resting EKG showed some slight non-specific T-wave abnormality and no signs of acute ischemia. (Tr. 202). On January 21, 1998, Plaintiff's blood pressure was 150/85. (Tr. 200). Plaintiff's blood pressure on March 12, 1998, was recorded at 180/102 and 150/102 on recheck. (Tr. 491). Dr. Nepomucemo saw Plaintiff on April 7, 1998 and reported a blood pressure reading of 190/100 on the right arm and 190/110 on the left. (Tr. 493). On April 21, 1998, Plaintiff was seen by Dr. Nepomucemo for a recheck of his blood pressure. (Tr. 167). Dr. Nepomucemo noted that Plaintiff's blood pressure was elevated at 166/110,

his lungs were clear and he had a normal heart rate and rhythm. (Tr. 167). On June 16, 1998, Plaintiff's blood pressure was 152/90. (Tr. 490). Plaintiff did not report any chest pains, shortness of breath, fever or chills. (Tr. 490). Dr. Nepomucemo noted that Plaintiff's hypertension was not well controlled, he had not yet quit smoking and that he suffered persistent lumbosacral pain. (Tr. 490).

On September 26, 1999, Plaintiff was admitted to Saint Anthony Medical Center for two days, complaining of chest pain. (Tr. 457-461). Dr. Mark Hiser, MD, saw Plaintiff and noted that he was very frightened and there were some minor abnormalities present on the EKG. (Tr. 458). Plaintiff underwent an angiography and angioplasty procedure on September 27, 1999. (Tr. 460-461). Dr. Hiser noted that Plaintiff had 3 vessel coronary disease. (Tr. 460). A stent was placed in the right coronary artery and angioplasty was performed. (Tr. 460). Dr. Hiser reported excellent results with respect to the right coronary artery and recommended careful follow-up and frequent testing as to the left coronary artery. (Tr. 461).

A stress test administered on December 15, 1999, indicated no cardiac symptoms, a mild increase in ST-T abnormalities, no significant defects, 48% ejection fraction, no evidence of reversible ischemia and borderline left ventricular systolic function. (Tr. 480).

On June 13, 2000, Plaintiff presented to the emergency room complaining of chest pain and underwent a left heart catheterization, coronary arteriogram, left ventriculogram, abdominal aortogram, angioplasty of the right iliac artery, PTCA of the one vessel, and stenting of the right coronary artery. (Tr. 636). Right iliac angiography indicated a 80-90% obstruction of the right common iliac artery. (Tr. 642). Successful angioplasty and stent placement was achieved and no residual stenosis was observed. (Tr. 642). Selective coronary angiogram indicated 50-70% stenosis

in the mid-left anterior descending artery (LAD), mild diffuse disease at the distal LAD and no disease at the diagonal. (Tr. 643). The angiogram also demonstrated severe in-stent restenosis of the right coronary artery at 95% obstructed. (Tr. 644). Plaintiff was referred for consideration of angioplasty of the right coronary artery. (Tr. 644). On June 14, 2000, rotoblator atherectomy and angioplasty was performed on the right coronary artery. (Tr. 650). A follow up angiogram indicated diffuse 20% residual obstruction and the loss of a right ventricular branch. (Tr. 650).

Medical-disability reports

A Residual Functional Capacity Assessment (RFC) was completed on January 22, 1999, by Dr. George Andrews, MD. (Tr. 433-440). Dr. Andrews found that Plaintiff is able to occasionally lift 20 pounds and frequently lift 10 pounds. (Tr. 434). Dr. Andrews indicated that Plaintiff is able to stand, sit or walk for six hours in an eight hour work day and is not limited in his ability to push or pull. (Tr. 434). As for Plaintiff's postural limitations, Dr. Andrews reported that Plaintiff is able to climb, balance, stoop, kneel, crouch and crawl occasionally. (Tr. 435). Dr. Andrews did not note any manipulative, visual, communicative or environmental limitations. (Tr. 436-437).

On January 25, 1999, Dr. Kamlesh Ramchandani, MD, evaluated Plaintiff and submitted a report to the Bureau of Disability Determination Services. (Tr. 429-432). Dr. Ramchandani noted that Plaintiff was alert and oriented with no acute distress. (Tr. 430). Plaintiff's blood pressure was 140/94, his gait was slow and measured and he was able to walk on the heels and toes gingerly. (Tr. 430). It was reported that Plaintiff used a cane for balance and support and can walk with or without the cane for half a block. (Tr. 429). As for Plaintiff's range of motion (ROM), Dr. Ramchandani indicated that Plaintiff's upper extremity strength was good with full ROM in the shoulder, elbow, wrist, knee, and cervical spine. (Tr. 431-432). Some loss of ROM was noted in Plaintiff's hips and

lumbar spine. (Tr. 432). Plaintiff was able to flex and extend his lumbar spine 40 degrees and lateral

flexion was only 10 degrees. (Tr. 432). Straight leg raising was 45 degrees and Dr. Ramchandani

noted no lower extremity weakness. Plaintiff reported that he smoked a half of a pack of cigarettes

each day, down from a pack and a half, drinks alcohol occasionally and takes the following

prescribed medications: Vicodin, Flexiril, Ultram, Monopril, Albuterol and Atrovent inhalers, Elavil,

Cardizem and Zocor. (Tr. 429).[1] Dr. Ramchandani indicated a diagnosis of discogenic disease of

---

[1] Vicodin - Hydrocodone (related to codeine) is in a class of drugs called narcotic analgesics. It relieves pain.

Ultram. Tramadol is a pain reliever. The exact way that tramadol works is unknown. Tramadol is used to relieve moderate to moderately severe pain.

Flexeril - Cyclobenzaprine is a muscle relaxant. It works by blocking nerve impulses (or pain sensations) that are sent to your brain.

Monopril HCT - Hydrochlorothiazide is a thiazide diuretic (water pill). It increases the amount of salt and water you lose in your urine.

Albuterol is a bronchodilator. It works by relaxing muscles in the airways to improve breathing. Albuterol inhalation is used to treat conditions such as asthma, bronchitis, and emphysema.

Atrovent Nasal. Ipratropium prevents nasal tissue from swelling and producing mucous. Ipratropium nasal spray is used to decrease excessive mucous associated with allergies and the common cold.

Elavil - Amitriptyline is in a class of drugs called tricyclic antidepressants. Amitriptyline affects chemicals in your brain that may become unbalanced and cause depression.

Cardizem - Diltiazem is in a class of drugs called calcium channel blockers.

Zocor - Simvastatin blocks the production of cholesterol (a type of fat) in the body.
*See*, Multum Drug Reference, *at* http://www.WebMD.com/drugs

the lumbar spine, chronic obstructive pulmonary disease and hypertension. (Tr. 430).

On June 9, 1999, Dr. Ramchandani submitted a pulmonary function test report to the Bureau of Disability Determination Services. (Tr. 426). Dr. Ramchandani reported that Plaintiff's effort for the test was intermediate. (Tr. 426).

Plaintiff is currently being treated by Dr. Pedro deGuzman, MD. Dr. deGuzman has certified that it is his opinion that Plaintiff is totally disabled dated September 5, 2000. (Tr. 794).


IV. **STANDARD OF REVIEW**

The court may affirm, modify, or reverse the ALJ's decision outright, or remand the proceeding for rehearing or hearing of additional evidence. 42 U.S.C. § 405(g). Review by the court, however is not *de novo*; the court "may not decide the facts anew, reweigh the evidence or substitute its own judgment for that of the ALJ." *Meredith v. Bowen*, 833 F.2d 650, 653 (7th Cir. 1987) (citation omitted); *see also Delgado v. Bowen*, 782 F.2d 79, 82 (7th Cir. 1986). The duties to weigh the evidence, resolve material conflicts, make independent findings of fact, and decide the case accordingly are entrusted to the commissioner; "[w]here conflicting evidence allows reasonable minds to differ as to whether a claimant is disabled, the responsibility for that decision falls on the Commissioner (or the Commissioner's delegate the ALJ)." *Richardson v. Perales*, 402 U.S. 389, 399-400 (1971), *Walker v. Bowen*, 834 F.2d 635, 640 (7th Cir. 1987). If the Commissioner's decision is supported by substantial evidence, it is conclusive and this court must affirm. 42 U.S.C. § 405(g); *see also Arbogast v. Bowen*, 860 F.2d 1400, 1403 (7th Cir. 1988). "Substantial evidence" is "such relevant evidence as a reasonable person might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 401.

The Seventh Circuit demands even greater deference to the ALJ's evidentiary determinations. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Where a witness credibility determination is based upon the ALJ's subjective observation of the witness, the determination may only be disturbed if it is "patently wrong" or if it finds no support in the record. *Kelley v. Sullivan*, 890 F.2d 961, 965 (7th cir. 1989), *Stuckey v. Sullivan*, 881 F.2d 506, 509 (7th Cir. 1989). "However, when such determinations rest on objective factors of fundamental implausibilities rather than subjective considerations, [reviewing] courts have greater freedom to review the ALJ decision." *Herron v. Shalala*, 19 F.3d 329, 335 (7th Cir. 1994), *Yousif v. Chater*, 901 F.Supp. 1377, 1384 (N.D.Ill. 1995).

## V.  FRAMEWORK FOR DECISION

The ALJ concluded that Plaintiff did not meet the Act's definition of "disabled," and accordingly denied her application for benefits. "Disabled" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382(c)(3)(A). A physical or mental impairment is one "that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic

15

techniques." 42 U.S.C. § 1382(c)(3)(C). *See Clark v. Sullivan*, 891 F.2d 175, 177 (7th Cir. 1988).

The Commissioner proceeds through as many as five steps in determining whether a claimant is disabled. 20 C.F.R. §§ 404.1520(a)-(f), 416.920(a)-(f) (1998).[2] The Commissioner sequentially determines the following: (1) whether the claimant is currently engaged in substantial gainful activity; (2) whether the claimant suffers from a severe impairment; (3) whether the impairment meets or is medically equivalent to an impairment in the Commissioner's Listing of Impairments; (4) whether the claimant is capable of performing work which the claimant performed in the past; and (5) whether the claimant is capable of performing any other work in the national economy.

At Step One, the Commissioner determines whether the claimant is currently engaged in substantial gainful activity. 20 C.F.R. § 404.1520 (a),(b). Substantial gainful activity is work that involves doing significant and productive physical or mental duties that are done, or intended to be done, for pay or profit. 20 C.F.R. § 404.1510. If the claimant is engaged in substantial gainful activity, he is found not disabled, regardless of medical condition, age, education, or work experience, and the inquiry ends; if not, the inquiry proceeds to Step Two.

Step Two requires a determination whether the claimant is suffering from a severe impairment.[3] A severe impairment is one which significantly limits the claimant's physical or mental ability to do basic work activities. 20 C.F.R. § 404.1520(c). The claimant's age, education,

---

[2]The Commissioner has promulgated parallel regulations governing disability determinations under Title II and Title XVI. See 20 C.F.R. Ch. III, Parts 404, 416. For syntactic simplicity, future references to Part 416 of the regulations will be omitted where they are identical to Part 404.

[3]The claimant need not specify a single disabling impairment, as the Commissioner will consider the combined affect of multiple impairments. See, e.g., 20 C.F.R. § 404.1520(c). For syntactic simplicity, however, this generic discussion of the Commissioner's decision-making process will use the singular "impairment" to include both singular and multiple impairments.

and work experience are not considered in making a Step Two severity determination. 20 C.F.R. § 404.1520(c). If the claimant suffers from severe impairment, then the inquiry moves on to Step Three; if not, then the claimant is found to be not disabled, and the inquiry ends.

At Step Three, the claimant's impairment is compared to those listed in 20 C.F.R. Ch. III, Part 404, Subpart P, Appendix 1. The listings describe, for each of the major body systems, impairments which are considered severe enough *per se* to prevent a person from doing any significant gainful activity. 20 C.F.R. §§ 404.1525(a). The listings streamline the decision process by identifying certain disabled claimants without need to continue the inquiry. *Bowen v. New York*, 476 U.S. 467 (1986). Accordingly, if the claimant's impairment meets or is medically equivalent to one in the listings, then the claimant is found to be disabled, and the inquiry ends; if not, the inquiry moves on to Step Four.

At Step Four, the Commissioner determines whether the claimant's residual functional capacity allows the claimant to return to past relevant work. Residual functional capacity is a measure of the abilities which the claimant retains despite his impairment. 20 C.F.R. § 404.1545(a). Although medical opinions bear strongly upon the determination of residual functional capacity, they are not conclusive; the determination is left to the Commissioner, who must resolve any discrepancies in the evidence and base a decision upon the record as a whole. 20 C.F.R. § 404.1527(e)(2); *Diaz v. Chater*, 55 F.3d 300, 306 n.2 (7th Cir. 1995). Past relevant work is work previously performed by the claimant that constituted substantial gainful activity and satisfied certain durational and recency requirements. 20 C.F.R. § 404.1465; Social Security Ruling 82-62. If the claimant's residual functional capacity allows him to return to past relevant work, then he is found not disabled; if he is not so able, the inquiry proceeds to Step Five.

17

At Step Five, the Commissioner must establish that the claimant's residual functional capacity allows the claimant to engage in work found in significant numbers in the national economy. 20 C.F.R. §§ 404.1520(f), 404.1566. The Commissioner may carry this burden by relying upon vocational expert testimony, or by showing that a claimant's residual functional capacity, age, education, and work experience coincide exactly with a rule in the Medical-Vocational Guidelines (the "grids"). *See* 20 C.F.R. Ch. III, Part 404 Subpart P, Appendix 2; *Walker v. Bowen*, 834 F.2d 635, 640 ( 7th Cir. 1987); Social Security Law and Practice, Volume 3, § 43:1. If the ALJ correctly relies on the grids, vocational expert evidence is unnecessary. *Luna v. Shalala*, 22 F.3d 687, 691-92 (7th Cir. 1994). If the Commissioner establishes that sufficient work exists in the national economy that the claimant is qualified and able to perform, then the claimant will be found not disabled; if not, the claimant will be found to be disabled.

## VI.    ANALYSIS

The court will proceed through the five step analysis in order.

A. Step One: Is the claimant currently engaged in substantial gainful activity?

In performing the Step One Analysis the ALJ found that Plaintiff had not engaged in any substantial gainful activity at any time relevant to his decision issued on . (Tr. 20).

Under ordinary circumstances, a claimant is engaged in substantial gainful activity if the claimant's earnings averaged more than seven hundred and eighty dollars per month for years after January 1, 2001. (20 C.F.R. § 1574 (b) (2) Table 1, as modified by 65 FR 82905, December 29, 2000).

The finding of the ALJ as to Step One of the Analysis is not challenged by either party and

18

the court finds no reason to disturb this finding. The ALJ's determination as to Step One of the Analysis is affirmed.

B. Step Two: Does the claimant suffer from a severe impairment?

In performing the Step Two Analysis the ALJ found Plaintiff suffered from severe impairments. Specifically, the ALJ found Plaintiff suffers a minimal disk protrusion, hypertension, coronary artery disease, tobacco abuse, status left heart catheterization and angioplasty and stenting of the right coronary artery. (Tr. 20).

Substantial evidence exists to support the ALJ's determination that Plaintiff suffers from severe impairments. This finding is not challenged by either party and the court finds no reason to disturb it. The ALJ's finding as to Step Two of the Analysis is affirmed.

C.    Step Three: Does claimant's impairment meet or medically equivalent to an impairment in the Commissioner's listing of impairments?

In performing the analysis for Step Three the ALJ determined that Plaintiff's impairments do not meet or equal any impairment in Appendix 1 to Subpart P of Regulations number 4. (Tr. 20). Plaintiff has asserted that his impairments are of listing level severity with regard to his spinal impairment, pulmonary impairment and cardiovascular impairment. Plaintiff has pointed to Section 1.05(c) of Appendix 1 to Suppart P, Regulation No. 4 of the Code of Federal Regulations in support of his contention regarding his spinal impairment. That provision states

> Other vertebrogenic disorders (e.g. herniated nucleus pulposis, spinal stenosis) with the following persisting for at least 3 months despite prescribed therapy and expected to last 12 months with both 1 & 2. (1) pain, muscle spasm, and significant limitations of motion of the spine; and (2) appropriate radicular distribution of significant motor loss with muscle weakness and sensory and reflex loss.

19

Plaintiff's medical records indicate that he does have a bulging disk that is impinging on the nerve root but that the disk is not herniated. (Tr. 134). Upon referral to a neurosurgeon, Dr. Soriano, Plaintiff was told that he was not a good surgical candidate. (Tr. 316). Dr. Soriano noted that Plaintiff was without any significant neurological deficit. (Tr. 176, 313). When Plaintiff was seen again by Dr. Soriano, several months later, Dr. Soriano did indicate a decrease in the right knee jerk, but reported that sensation was intact and there was no sign of atrophy. (Tr. 311). Dr. Soriano further reported that he did not believe Plaintiff's leg pain emanated from the disks. (Tr. 342). The most recent MRI of the spine demonstrate a stable bulge at the L5-S1 with no stenosis. (Tr. 559). As to Plaintiff's other impairments, he provided no evidence that they were of listing level severity.

In accordance with the above, this court finds substantial evidence exists to support the ALJ's finding and this court finds no reason to disturb it. Therefore, the ALJ's determination as to Step Three of the Analysis is affirmed.

D.    Step Four: Is the claimant capable of performing work which the claimant performed in the past?

In performing the analysis for Step Four, the ALJ determined that Plaintiff is unable to perform any of his past relevant work. The finding of the ALJ as to Step Four of the Analysis is not challenged by either party and the court finds no reason to disturb this finding. The ALJ's determination as to Step Four of the Analysis is affirmed. (Tr. 21).

E.    Step Five: Is the claimant capable of performing any work existing in substantial numbers in the national economy?

At Step Five the ALJ determined that although Plaintiff's Residual Functional Capacity did not allow him to perform the full range of sedentary work, there existed a significant number of jobs

in the national economy that he can perform. (Tr. 18).

The ALJ began by determining Plaintiff's RFC. The ALJ found that Plaintiff was capable of standing and/or walking for a total of two hours in an eight hour work day, lifting ten pounds occasionally and five pounds frequently. With respect to that RFC determination and pursuant to 20 C.F.R. 404.1567, the ALJ determined that Plaintiff had the maximum sustained work capability for a limited range of sedentary work. (Tr. 21). The ALJ also noted that Plaintiff was characterized as a younger individual. (Tr. 21). At the time of the hearing Plaintiff was 47 years old and falls into the range of individuals 45-49 classified as younger individuals. 20 C.F.R. 404.1563. (Tr. 21). Pursuant to 404 C.F.R. 1564, Plaintiff is classified as having a limited education, having completed school through the eighth grade. (Tr. 21). Finally, though Plaintiff's past work was considered skilled, the acquired skills are not transferable, given Plaintiff's exertional limitations. (Tr. 21). The ALJ considered these factors in relying on Medical-Vocational Rule 201.19 (of the Medical Vocational Guidelines or "grids") to determine that Plaintiff is not disabled.

The grids represent major functional and vocational patterns and the analysis of various vocational factors. They allow the ALJ to make a determination as to whether an individual is disabled in cases where the findings of fact with respect to the individual's vocational factors and RFC coincide with all the criteria of a particular rule. Appendix 2, Suppart P, Part 404. In this case, the ALJ determined that Plaintiff's vocational factors and RFC fell squarely within Medical-Vocational Rule 201.19. That Rule directs a finding of not disabled in a case where a younger individual can perform the full range of sedentary work, has had a limited education and has no transferable skills.

The ALJ found that Plaintiff can perform a limited range of sedentary work. The ALJ found

that Plaintiff could stand for two hours in an eight hour day and lift ten pounds occasionally and five pounds frequently. In the hearing decision, the ALJ does not specify why Plaintiff is then only able to perform a limited range of sedentary work. While Plaintiff's medical and vocational factors indicate that he may not be capable of performing the types of occupations that fall into the sedentary category -- clerical, administrative, technical and benchwork, the ALJ does not specify what factor specifically precluded Plaintiff from being able to perform the full range of sedentary work. Great deference is due to the ALJ's evidentiary determinations according to Seventh Circuit case law. So long as the ALJ "minimally articulate[s] his reasons for crediting or rejecting evidence of disability," the determination must stand on review. *Scivally v. Sullivan*, 966 F.2d 1070, 1076 (7th Cir. 1992). Minimal articulation means that an ALJ must provide an opinion that enables a reviewing court to trace the path of his reasoning. *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001), *Walker v. Bowen*, 834 F.2d 635, 643 (7th Cir. 1987), *Stephens v. Heckler*, 766 F.2d 284, 287 (7th Cir. 1985). Here the ALJ failed to adequately explain the reasoning behind his determination that Plaintiff was capable of performing only a limited range of sedentary work. If Plaintiff is not capable of performing a full range of sedentary work, then the ALJ was not justified in relying on the grids. The Medical-Vocational Guidelines state "Where any one of the findings of fact does not coincide with the corresponding criterion of a rule, the rule does not apply in that particular case and, accordingly, does not direct a conclusion of disabled or not disabled." Section 200.00(a), Appendix 2, Suppart P, Part 404.

In reaching his RFC determination and with respect to Plaintiff's complaints of disabling pain, the ALJ found that Plaintiff's claims were not entirely credible and did not accept Plaintiff's claims regarding his limitations as a result of that pain. (Tr. 18). The ALJ noted that Plaintiff had

22

been able to manage his symptoms through medication, that Plaintiff did not appear to be in any discomfort during the hearing (which lasted 35 minutes), that Plaintiff's descriptions of his pain were so severe as to be implausible and that there were no reports from Bureau of Disability Determination Services employees relating any difficulties they observed Plaintiff having. (Tr. 18-19). The ALJ further noted that his RFC determination is supported by both Plaintiff's treating physicians and the physicians employed by the Bureau of Disability Determination Services. (Tr. 18). Specifically, the ALJ notes that Dr. deGuzman and Dr. Hiser both indicated that the claimant was capable of sedentary work. (Tr. 18).

Plaintiff's medical records demonstrate that Plaintiff has a bulging disk that is causing nerve root compression. While the MRI's do not support a finding of disability at Step Three pursuant to the Listing of Impairments, the fact that the nerve root is being impinged substantiates Plaintiff's complaints of pain regardless of whether the disk is actually herniated or merely bulging. Also, the ALJ stated that while the treatments and medication Plaintiff received would normally support his allegations, the treatment and medications have been relatively effective in controlling his symptoms and therefore do not support a finding of greater limitations than those previously determined. However, the medical records indicate that Plaintiff suffered from uncontrolled high blood pressure and that he consistently complained of low back pain and leg pain and numbness. Plaintiff's treatment notes demonstrate that Plaintiff often suffered from paravertebral muscle spasms, had tenderness in the lumbosacral area and walked with a limp. Other than a few isolated treatment records, the majority of the medical records substantiate Plaintiff's complaints of persistent pain in spite of the medications he was taking.

Generally, an ALJ's credibility determinations will not be overturned unless they are found

to be patently wrong. *Zurawski v. Halter*, 245 F.3d 881 (7th Cir. 2001)(citing *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000)). While great deference is due the ALJ, particularly with respect to credibility determinations, this court finds that the ALJ erred in disregarding Plaintiff's assertions of disabling pain. While the ALJ specifically noted that Plaintiff's demeanor cannot be considered a conclusive indicator of his overall level of pain, the fact that Plaintiff was before the ALJ for only 35 minutes precludes its use as an indicator at all. The transcript of the hearing indicates that the interaction between the ALJ and Plaintiff was minimal, the ALJ directed the majority of her questions to Plaintiff's counsel. Similarly, the ALJ's observation that Plaintiff's allegations of pain were beyond credibility and were implausible in and of themselves is circular and does not assist this court in its review of the ALJ's findings. Plaintiff's testimony as to his pain is found on page 42 of the administrative record. (Tr. 42). In response to a question from his attorney about his back Plaintiff stated "I noticed that my, I still had (inaudible) pain in my lower back and then it generating down my right leg, which the left leg mainly was hurting me. It started generating down both legs, and had a burning situation going down my legs and numbness and --." (Tr. 42). Plaintiff also testified that the pain occurred daily and kept him from sleeping comfortably. (Tr. 42). The ALJ has offered a host of reasons for her determination as to Plaintiff's credibility. However, as a whole, the reasons are not supported by the record.

The ALJ cites to Exhibits 1F and 7F as reporting that Plaintiff's treating physicians indicated he was capable of performing sedentary work. (Tr. 18). This court notes that Exhibit 1F is the treatment notes of Dr. Lidvall from 1996. (Tr. 107-114). At that time, Dr. Lidvall did indicate that Plaintiff could return to work with a weight restriction and no repetitive motion. (Tr. 107-114). Exhibit 7F is the report of Dr. Koehler. (Tr. 162-163). Dr. Koehler's report of March 5, 1998,

indicated that Plaintiff's current back problems were not the same as those in 1996, in that the MRI's indicated a new herniation, and that Plaintiff could be returned to work with stringent restrictions to avoid further nerve root compression. (Tr. 162-163). These medical records provide little support for the ALJ's RFC determination. The records from Dr. Lidvall predate the hearing by three years and do not reflect the progressive nature of Plaintiff's injury or his later occurring cardiovascular and pulmonary impairments. Similarly, Dr. Koehler's report is a fitness for duty evaluation performed for Plaintiff's employer and does not appear to take into account Plaintiff's cardiovascular and pulmonary impairments. (Tr. 162-163). As to the non-treating physicians' reports, this court finds the RFC assessment completed by Dr. Andrews in January of 1999 to be completely inconsistent with the medical record as a whole. (Tr. 433-440). Despite the evidence in the medical records indicating that Plaintiff suffered from severe impairments including a bulging disk and impinged nerve, hypertension, cardiovascular disease and pulmonary impairments, Dr. Andrews indicated that Plaintiff was capable of walking or standing for six hours in an eight hour work day. The only limitation noted by Dr. Andrews was the amount of weight Plaintiff could lift. This is not consistent with Plaintiff's medical records or, even the ALJ's findings. Finally, the report of Dr. Ramchandani, the examining, non-treating physician retained by the Bureau of Disability Determination Services, did not indicate what limitations should be placed on Plaintiff with respect to work activities and primarily provided a review of Plaintiff's impairments.

For the above reasons, this court finds that the ALJ erred in disregarding Plaintiff's claims of limitations due to pain.

Finally, even if Plaintiff were capable of performing the full range of sedentary work, the Medical-Vocational Guidelines provide

25

> Vocational adjustment to sedentary work may be expected where the individual has special skills or experience relevant to sedentary work or where age and basic educational competences provide sufficient occupational mobility to adapt to the major segment of unskilled work. Inability to engage in substantial gainful activity would be indicated where an individual who is restricted to sedentary work because of a severe medically determinable impairment lacks special skills or experience relevant to sedentary work, lacks educational qualifications applicable to most sedentary work (e.g. has limited education or less) and the individual's age, though not necessarily advanced, is a factor which significantly limits vocational adaptability. Section 201.00(c) of Appendix 2, Suppart P, Part 404.

Plaintiff falls squarely within the class of individuals envisioned in Section 201.00(c). Plaintiff is not classified as an individual of advanced age or closely approaching advanced age, though if he were, the grids would direct a finding of disabled. This court does note that Plaintiff's current age is 49 and he is less than eight months away from being classified as an individual closely approaching advanced age. Even at the time of the ALJ's hearing and decision Plaintiff was 47 years old and the ALJ should have considered the impact of his occupational adaptability pursuant to Section 201.00(c). This is not to say that the ALJ should have utilized the grids as if Plaintiff were in a different age classification. However, in this case, given Plaintiff's vocational factors and RFC, the ALJ should have utilized the services of a vocational expert. As stated above, at Step Five of the analysis, the burden is on the Commissioner to demonstrate the existence of substantial jobs in the national economy which Plaintiff is capable of performing. The ALJ erred in not addressing the ramifications of Section 201.00(c) or seeking the assistance of a vocational expert to determine whether a substantial number of jobs exist which Plaintiff can perform given his vocational factors, RFC and adaptability.

## VII. CONCLUSION

For the above reasons, this court grants Plaintiff's motion for summary judgment and denied Defendant's motion for summary judgment. It is ordered that this case be remanded for a redetermination of Plaintiff's Residual Functional Capacity in light of this court's findings. It is further ordered that a vocational expert be consulted to determine whether Plaintiff is capable of performing a substantial number of jobs existing in the economy as provided for in Step Five of the sequential analysis.

**ENTER:**

P. MICHAEL MAHONEY, MAGISTRATE JUDGE
UNITED STATES DISTRICT COURT

DATE: 3/28/02